UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KRISTIN MARIE COE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 15-30037-MGM |
| CAROLYN W. COLVIN, | * | |
| Acting Commissioner of Social | * | |
| Security Administration, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S
MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANTS MOTION FOR ORDER AFFIRMING COMMISSIONER
(Dkt. Nos. 13 and 17)

June 15, 2016

MASTROIANNI, U.S.D.J.

## I.   INTRODUCTION

This is an action for judicial review of a final decision by Carolyn Colvin, the Acting

Commissioner of the Social Security Administration ("Commissioner"), regarding an individual's

entitlement to Social Security Disability Insurance ("SSDI") benefits pursuant to 42 U.S.C. § 405(g)

and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1383(c)(3). Kristin Marie Coe

("Plaintiff") asserts the Commissioner's decision to deny her such benefits—memorialized in a

November 20, 2013 decision of an administrative law judge ("ALJ")—was in error. Plaintiff has filed

a motion for judgment on the pleadings and the Commissioner has moved to affirm. For the

reasons set forth below, the court allows the Commissioner's motion (Dkt. No. 17) and denies

Plaintiff's motion (Dkt. No. 13).

## II.  BACKGROUND

A.  Procedural History

Plaintiff applied for SSDI and SSI on May 27, 2009 and alleged disability since October 15, 2007. (Administrative Record ("A.R.") 120-130.) Plaintiff was notified by the Social Security Administration that her claims had been initially denied on or about September 1, 2009, and had subsequently been denied upon reconsideration. (*Id.* at 55-58, 63-68.) Plaintiff requested a hearing in front of an administrative law judge, which took place on May 12, 2011. (*Id.* at 8-16.) In a written decision, the ALJ determined Plaintiff was not disabled. *(Id.)* The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision final and ripe for judicial review. (*Id.* at 5-7.) Plaintiff filed a complaint in the U.S. District Court on October 14, 2011. On June 8, 2012, the court granted the Commissioner's assented-to motion for remand, which sought to have the ALJ re-evaluate certain evidence and further consider Plaintiff's residual functional capacity ("RFC"). (*Id.* at 740.)

On November 20, 2013, the ALJ on remand again found Plaintiff not disabled. (*Id.* at 670-692.) On January 8, 2015, the Appeals Council denied Plaintiff's request for review and the ALJ's decision became final and ripe for judicial review. (*Id.* at 660-64, 665-69.) Thereafter, Plaintiff filed the instant action, the commissioner compiled the administrative record, and the parties filed the cross-motions presently at issue.

B.  Medical History on Record

Plaintiff alleges disability due to anxiety, depression, attention deficit hyperactivity disorder ("ADHD"), and fibromyalgia. (*Id.* at 154.) Plaintiff was 27 years old on the alleged disability onset date of October 15, 2007. (*Id.* at 673, 690). She received her GED and her previous work experience has been that of a store clerk, dishwasher, machine operator, pharmacy clerk, and teacher's aide. (*Id.* at 155, 160.)

On December 23, 2008, Dr. Lawrence Ufford conducted an initial neurological examination of Plaintiff. (*Id.* at 205-07.)  At this appointment, Plaintiff reported recent falls and a previous diagnosis of fibromyalgia. (*Id.*) Dr. Ufford detected sixteen possible trigger points and suspected "that [Plaintiff's] falls are related to focal symptomatology at the knee and surrounding insertions, perhaps related to post-traumatic arthritic change or fibromyalgia." (*Id.* at 206-207.) At this examination, Plaintiff denied drug and alcohol use and her medications consisted of Adderall, Valium, and Motrin. (*Id.* at 206.) On January 16, 2009, Dr. Ioana Stanescu conducted a rheumatologic examination of Plaintiff and confirmed the diagnosis of fibromyalgia. (*Id.* at 209, 676.) Dr. Stanescu observed tenderness at all fibromyalgia tender points, but no swelling or tenderness in any of the joints. (*Id.*) Dr. Stanescu saw Plaintiff for a follow-up appointment on March 16, 2009, where Plaintiff reported that her musculoskeletal pain had improved and "she is doing better [overall]." (*Id.* at 215.) Plaintiff reported "she does not consider attending a pain clinic at this point," and Dr. Stanescu recommended "regular exercises, daily walking, and regular gentle stretching." (*Id.*)

On June 12, 2009, Plaintiff met with Dr. Muhammad Gul to establish a primary care relationship. Dr. Gul confirmed the diagnosis of fibromyalgia and recommended Plaintiff increase her physical activity to help control her pain. (*Id.* at 291-93.)  Plaintiff admitted to both drug and alcohol use. (*Id.* at 292.) A laboratory report issued on June 23, 2009 was positive for amphetamines, benzodiazepines, opiates, and cannabis. (*Id.* at 218.)  On July 21, 2009, Dr. S. Ram Upadhyay completed a Physical Residual Functional Capacity Assessment upon examination of Plaintiff's file in which he confirmed a diagnosis of fibromyalgia and counseled limitation to light exertion, with occasional prolonged postures, and avoiding hazardous environments. (*Id.* at 297-304, 687.)

On March 23, 2010, Plaintiff reported to Dr. Karen Kelly, who was treating Plaintiff for sinus complaints, a history of using drugs and alcohol since the age of seventeen. (*Id.* at 373.) On

March 29, 2010, Plaintiff presented for intake at the On Call Urgent Care center for Suboxone treatment. (*Id.* at 467.) There, Plaintiff reported drug use since the age of nineteen and tested positive for marijuana, benzodiazepines, oxycodone, and buprenorphine. (*Id.*) During an April 12, 2010 appointment with Dr. Gul, Plaintiff reported she had no knowledge or explanation for why she had tested positive when asked about a prior toxicology screen that was positive for marijuana and Suboxone. (*Id.* at 375-77.)

On June 2, 2010, Plaintiff was taken to Berkshire Medical Center by police due to apparent opiate overdose. (*Id.* at 608, 612.) A significant number of pills were found to be missing from Plaintiff's prescription of Adderall and Soma, both of which were recently filled. (*Id.* at 612.) When questioned, Plaintiff denied intention of overdose. (*Id.*) The medical report stated that Plaintiff "told the admitting doctor in the emergency room that she gave some of her medications to a friend . . . but she told the admitting nurse that her medications were stolen from her." (*Id.*)  Plaintiff reported using drugs and alcohol since the age of fourteen and, at that point in time, using cannabinoids occasionally, the last occasion being Memorial Day 2010. (*Id.* at 613-14.)

On June 17, 2010, Plaintiff underwent a consultative examination with Dr. Kautilya Puri, where Plaintiff reported a history of fibromyalgia, depression, anxiety, and ADHD. (*Id.* at 360-64.) Plaintiff reported that she can do some cooking, cleaning, laundry, and child care and can manage personal grooming. (*Id.*) Dr. Puri noted that Plaintiff could perform a full squat, used no assistive devices, required no assistance changing for the exam or getting on and off exam table, and "appeared to be in no acute distress." (*Id.* at 361.) Dr. Puri reported that Plaintiff's "hand and finger dexterity [were] intact" and she had no objective limitations to "fine motor or gross motor activity." (*Id.* at 362.) Further, Dr. Puri reported that "there were no objective limitations to . . . [Plaintiff's] activities of daily living." (*Id.*) During that visit, Plaintiff denied use of alcohol or street drugs. (*Id.* at

360.) On a toxicology screen from a June 24, 2010 Suboxone treatment, Plaintiff tested positive for buprenorphine, benzodiazepines, and marijuana. (*Id.* at 492.)

On October 8, 2010, Plaintiff established care with Joan McFadden, M.D. and reported worsened pain from her original fibromyalgia diagnosis. (*Id.* at 366.) On examination, Plaintiff presented with a normal affect and good eye contact, was well groomed, and appeared in no acute distress. (*Id.*) During an April 15, 2011 appointment, Dr. McFadden conducted a brief examination and noted that Plaintiff was in no acute distress and sat comfortably for the entire 25-minute encounter. (*Id.* at 886.) Dr. McFadden also noted that this was "somewhat in contrast to her reported ability to sit for no longer than five minutes at a time because of stiffness and discomfort." (*Id.*) Dr. McFadden completed a Residual Functional Capacity Assessment on April 15, 2011, in which she found Plaintiff limited to less than sedentary exertion with the ability to sit or stand for 30 minutes at one time. (*Id.* at 649-53.) In an eight-hour working day, Dr. McFadden found Plaintiff able to sit for a total of three hours and stand or walk for a total of one hour with the need for walking breaks for a total of 30 minutes at five minute increments each break. (*Id.* at 651.) She also found Plaintiff could never lift over 20lbs and could rarely stoop, crouch or squat, climb ladders, or climb stairs. (*Id.* at 651-52.) Dr. McFadden estimated that Plaintiff would likely be absent from work as a result of her impairments more than four days per month. (*Id.* at 652.) She also characterized Plaintiff's pain as occurring throughout Plaintiff's body and "precipitated by heavy activity." (*Id.* at 649.) Dr. McFadden noted in her treatment record from the April 15, 2011 appointment that her answers to the Residual Functional Capacity Assessment were "completed to the best of [her] ability" and that "these estimates are difficult to make." (*Id.* at 886.)

Plaintiff had follow-up appointments with Dr. McFadden on December 6, 2011 and February 10, 2012. (*Id.* at 878, 881.) On December 6, 2011, Plaintiff reported continued pain throughout her body and lower back, but refused further testing at the time due to scheduling

conflicts. (*Id.* at 881.) Dr. McFadden noted Plaintiff appeared well developed and in "no acute distress." (*Id.* at 882.) On February 10, 2012, Plaintiff reported continued pain in her lower back and that while her symptoms had improved somewhat after her last visit, they have since become "much worse." (*Id.* at 878.) During this visit, Plaintiff denied drug use. (*Id.*) At a Suboxane maintenance treatment on February 14, 2012, Plaintiff denied drug use and tested positive for cannabinoids, amphetamines, and buprenorphine. (*Id.* at 998-1001.)

At the administrative hearing on September 24, 2013, Plaintiff testified that she is unable to work due to depression, ADHD, and continuous pain. (*Id.* at 705.) She described the pain from the fibromyalgia as a sharp, burning pain with numbness in her hands during a flare-up. (*Id.* at 707.) Plaintiff testified that her fibromyalgia flare-ups are also associated with "bad migraines," preventing her from "[getting] off the couch." (*Id.* 707-08.) She further testified that walking, going up and down stairs, and lifting aggravated her pain and that she was unable to stand without resting for more than "a minute or two" due to being "off balance." (*Id.* at 710.) Plaintiff testified that that she suffers from bilateral hand pain and is unable to lift or fold laundry and that her "hands won't work." (*Id.* at 714.)

Also at the hearing, vocational expert Jeff R. Blank, Ph.D. testified as to the exertional level of Plaintiff's past work experience and as to availability of past work in consideration of certain hypothetical limitations. (*Id.* at 724-28.) The ALJ posed hypotheticals to Dr. Blank where he asked whether work would be available if certain limitations were imposed. (*Id.*) Dr. Blank answered that an individual would not be able to perform certain past work performed by Plaintiff, but would be able to perform work as a small parts assembler, packager, or buffer or grinder when posed the following hypothetical:

> . . . Assume we have an individual with the same age, educational background and past work experience as [Plaintiff]. Further assume the individual retains the residual functional capacity for work with the following additional limitations. She would be limited to light work. She would require a sit/stand option. There would be no more

than occasional climbing, stooping, bending, balancing, twisting, kneeling, or crawling. There would be no heights or ladders, no hazards of dangerous machinery. She would be limited to simple, routine, one-to-two-step repetitive tasks, which require limited concentration and there would be no interaction with the general public, minimal contact or interaction with coworkers. Given those limitations, could such an individual perform the claimant's past work or any other work?

(*Id.* at 726.)

### III.   STANDARD OF REVIEW

The role of a district court reviewing an administrative law judge's decision is limited to determining whether the conclusion was supported by substantial evidence and based on the correct legal standard. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3); *Manso-Pizarro v. Sec'y of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). Even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F. 2d 218, 222 (1st Cir. 1981)). Additionally, it is the Commissioner's responsibility to weigh conflicting evidence and decide issues of credibility. *Rodriguez,* 647 F.2d at 222.

### IV.   DISABILITY STANDARD AND THE ALJ'S DECISION

An individual is entitled to SSDI benefits if, among other things, she has an insured status and, prior to its expiration, is disabled. *See* 42 U.S.C. § 423(a)(1)(A) and (D). Entitlement to SSI, on the other hand, requires a showing of both disability and financial need. *See* 42 U.S.C. § 1381a. Neither Plaintiff's insured status nor her financial need is challenged. Therefore, whether Plaintiff has a disability such that she may qualify for SSDI and SSI is the only issue at hand.

The Social Security Act (the "Act") defines disability, in part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual is considered disabled under the Act:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). *See generally Bowen v. Yuckert*, 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do other work, the application is granted.

*See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Goodermote v. Sec'y of HHS*, 690 F.2d 5, 6-7 (1st Cir. 1982).

In the instant case, at step one, the ALJ found that Plaintiff had not performed any substantial gainful activity after her alleged onset date of October 15, 2007. (A.R. 676.) Moving to step two, the ALJ found Plaintiff had several severe impairments during this period, specifically, anxiety, depression, and ADHD. (*Id.*) At the third step, the ALJ determined Plaintiff's impairments do not, singly or in combination, meet the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1. (*Id.* at 683.) The ALJ found that Plaintiff's RFC allows her to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that Plaintiff is limited to work

with the following accommodations: sit or stand at will option; no exposure to unprotected heights, such as ladders; no exposure to hazards such as dangerous machinery; no more than occasional climbing, stooping, bending, balancing, twisting, kneeling, or crawling; simple, routine one to two step tasks that require limited concentration; no interaction with the general public; and no more than minimal interaction with co-workers. (*Id.* at 684.) In light of this RFC, the ALJ found at the fourth step that Plaintiff is unable to perform any past relevant work.  (*Id.* at 690.) At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform other work "existing in significant numbers in the national economy," including occupations such as a small parts assembler, packager, or buffer or grinder. (*Id.* at 690, 691.) As a result, the ALJ determined that Plaintiff was not disabled and her application for SSDI and SSI benefits was denied. (*Id.* at 691.)

## V.   ANALYSIS

Plaintiff argues the ALJ erred by not concluding that Plaintiff's fibromyalgia was severe; by giving little weight to the opinion of Dr. McFadden with regard to Plaintiff's physical impairments, specifically her fibromyalgia, when assessing her RFC; and by focusing on Plaintiff's past history of substance abuse in assessing her credibility. The court finds Plaintiff's arguments unavailing and the ALJ's decision supported by substantial evidence.

A.   Assessment of the Severity of the Plaintiff's Fibromyalgia

Plaintiff first argues the ALJ erred by failing to conclude that Plaintiff's fibromyalgia was a severe impairment. Plaintiff asserts that "the medical evidence supports a diagnosis of fibromyalgia and  . . . it should have been determined to be a severe impairment." (Dkt. No. 14, Mem. in Supp. of Mot. for J. on the Pleadings at 12 ("Pl. Mem.")). The Commissioner argues that the ALJ did, in fact, consider Plaintiff's fibromyalgia to be severe despite omitting "fibromyalgia" from the heading listing the severe impairments. (Dkt. No. 18, Mem. in Supp. of Mot. to Affirm the Decision of the

Commissioner at 10 ("Defn. Mem.")) The Commissioner also argues that any error at step two "was harmless because the ALJ considered fibromyalgia throughout the sequential evaluation process and incorporated limitations into the RFC to account for the condition." (*Id.* at 11.) The court agrees with the Commissioner that the ALJ's assessment of the severity of Plaintiff's fibromyalgia did not constitute reversible error.

"A 'severe impairment' means an impairment 'which significantly limits the [plaintiff's] physical or mental capacity to perform basic work related functions.' If the [plaintiff] does not have an impairment of at least this degree of severity, [she] is automatically considered not disabled." *Goodermote*, 690 F.2d at 6 (quoting 20 C.F.R. § 404.1520(c)). In other words, if the administrative law judge determines that none of the plaintiff's impairments amount to a "severe impairment," the inquiry ends at step two and the plaintiff is deemed not disabled. "If the hearing officer deems the impairment severe he then undertakes the third step of the analysis, where he determines if the severity of the impairment is such that it is 'equivalent to a specific list of impairments contained in the regulations.'" *Peters v. Colvin*, 133 F. Supp. 3d. 273, 279 (D. Mass. 2015) (quoting *Goodermote*, 690 F.2d at 6).

Although the ALJ failed to include fibromyalgia in the heading listing Plaintiff's severe impairments, the ALJ nonetheless discussed Plaintiff's fibromyalgia along with the other severe impairments. (A.R. 676-682.) Further, the ALJ did not include fibromyalgia within the list of "non-severe impairments," and noted that Plaintiff's reported pain that did not rise to the level of a severe impairment was "separate from her fibromyalgia pain." (*Id.* at 682.) Additionally, the ALJ's consideration of fibromyalgia at step three to determine whether it meets or medically equals the severity of one of the listed impairments in Appendix 1 further supports that the ALJ did, in fact, determine fibromyalgia was a severe impairment. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (concluding that "any error [regarding the severity analysis at step two] became harmless

when the ALJ reached the proper conclusion that [the plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.").

Furthermore, as articulated by the Commissioner, the ALJ discussed and considered the Plaintiff's fibromyalgia in assessing her RFC and imposing physical limitations. (Defn. Mem. 10; A.R. 687.) S*ee Burgin v. Comm'r of Soc. Sec.*, 2011 WL 1170733, at *1 (11th Cir. Mar. 30, 2011) (finding the administrate law judge's failure to denote certain impairments as severe at step two was harmless because "[the] finding of any severe impairment . . . is enough to satisfy step two" and "the ALJ considered all of [plaintiff's] impairments in combination at later steps in the evaluation process"). As the ALJ explained, "[t]he most consistent finding is the [Plaintiff's] positive trigger points consistent for fibromyalgia." (A.R. 687.)  The ALJ included "a sit/stand option to account for the [Plaintiff's] consistent reporting that prolonged postures aggravate her pain" and precluded "[Plaintiff] from exposure to unprotected heights, hazardous environments, and ladders to address her susceptibility to loss of balance and falling due to her fibromyalgia." (*Id.* at 687.) Lastly, the ALJ noted that "[t]here are no objective findings [Plaintiff's] fibromyalgia limits her ability to perform lifting/reaching/overhead activity." (*Id.*) Such specific consideration of fibromyalgia in establishing the Plaintiff's manipulative limitations evidences that the ALJ considered the impairment to be severe. (Defn. Mem. 11.) Moreover, any error in failing to explicitly include fibromyalgia in the list of severe impairments was harmless because the ALJ appropriately considered fibromyalgia throughout the evaluation process and accounted for the impairment in his determination of Plaintiff's RFC. *See Perez v. Astrue*, 2011 WL 6132547, at *4 (D. Mass. Dec. 7, 2011) ("Any error [made by the ALJ in failing to determine whether a certain impairment was severe at step two] was harmless, however, as the ALJ explicitly considered 'all symptoms,' both severe and non-severe, in assessing Plaintiff's residual functional capacity . . .").

B. Weight of Treating Source's Opinion with regard to Plaintiff's Fibromyalgia

Plaintiff next argues the ALJ failed to afford proper weight to Dr. McFadden's opinion with regard to Plaintiff's physical impairments, specifically, her fibromyalgia, when assessing her RFC and impermissibly required objective findings to support Dr. McFadden's RFC opinion. The Commissioner contends that the ALJ appropriately assigned little weight to Dr. McFadden's opinion and such determination is supported by substantial evidence in the record. In consideration of the record as a whole, the court agrees with the Commissioner.

"Hearing officers must evaluate medical opinions, regardless of their source, according to all of the following factors: (1) whether the medical opinion is based on an actual examination; (2) if a treatment relationship exists, the length of the treatment, frequency of examination, and nature and extent of the relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialty of the opinion-giver; and (6) other factors that support or contradict the opinion." *Small v. Astrue*, 840 F. Supp. 2d 458, 465 (D. Mass. 2012) (citing 20 C.F.R. § 404.1527(c)(1)-(6)). The Social Security Administration's regulations provide that an administrative law judge generally will "give more weight to opinions from [a plaintiff's] treating sources, since those sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the plaintiff's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). Furthermore, if "a treating source's opinion . . . is well-supported by medically acceptable . . . diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

However, "[w]hen a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply." *Shaw v. Sec'y of Health & Human Servs.*, 1994 WL 251000, at *3 (1st Cir. Jun. 9, 1994) (unpublished). "When treating sources' opinions are not given controlling weight, hearing officers must provide 'good reasons' for their

decision." *Small*, 840 F. Supp. 2d at 465 (citing §§ 404.1527(c)(2) and 416.927(c)(2)). Findings by an administrative law judge that a treating source's opinion "conflict[s] with other evidence in the record" and that the plaintiff's allegations of symptoms are not "entirely credible in light of the information contained in the documentary reports, as well as the reports of the treating and examining physicians during the period at issue," are adequate reasons to justify not giving controlling weight to a treating source's opinion. *Berrios-Velez v. Barnhart*, 402 F. Supp. 2d 386, 392 (D. P.R. 2005) (holding administrative law judge adequately explained his reasons for not giving controlling weight to plaintiff's treating physician); *see Bourinot v. Colvin*, 95 F. Supp. 3d 161, 176-77 (D. Mass. 2015) (finding where "there is a steady, significant disconnect between Plaintiff's symptoms as described in the records and the limitations described in the primary care physicians' impairment questionnaires, . . . the ALJ [is permitted] to discount the treating physician's opinions"); *see also id.* at 177 (finding where "treating source opinions are inconsistent with other substantial evidence in the record, the SSA regulations do not require an [administrative law judge] to give the opinions controlling weight" and "it was not unreasonable for the ALJ to infer that the questionnaires submitted by her treating physicians exaggerated the extent of her physical limitations") (citing *Arruda v. Barnhart,* 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. §§ 404.1527(c)(3), (4) and 416.927(c)(3), (4); Social Security Ruling ("SSR") 96–2p, 1996 WL 374188, at *2 (July 2, 1996)).

The ALJ appropriately weighed Dr. McFadden's opinion and provided sufficient explanation for his decision. First, the ALJ found that "[t]he treatment records of Dr. McFadden do not support such significant physical limitations" as were provided in Dr. McFadden's Residual Functional Capacity Assessment. (A.R. 688.)  In the Residual Functional Capacity Assessment completed by Dr. McFadden on April 15, 2011, she found Plaintiff "limited to less than sedentary exertion and capable of only sitting 3 hours a day and standing [or] walking [one] hour a day" with the "need for a

break every 30 minutes." (A.R. 651.) Dr. McFadden also found that Plaintiff would likely be absent

from work as a result of her impairments more than four days per month. (A.R. 651.) In the

treatment record from the April 15, 2011 appointment, Dr. McFadden noted that Plaintiff described

her limitations as an "inability to handle stressful environments due to distractibility and panic

attacks" and needing assistance with "household activities such as shopping, heavy cleaning, and

lifting heavy objects." (*Id.* at 886.) Notably lacking from all of Dr. McFadden's treatment records is

any corroboration of the physical limitations she assessed in the Residual Functional Capacity

Assessment. Without any clear evidence from the treatment records to support such extreme

limitations, the ALJ was justified in concluding that the limitations articulated by Dr. McFadden did

not accurately reflect Plaintiff's limitations, especially in consideration of the treatment records of

Dr. Ufford, Dr. Gul, and Dr. Puri, all of whom confirmed a diagnosis of fibromyalgia, but did not

find limitations to the same degree as Dr. McFadden. After all, it is the administrative law judge's

duty to resolve conflicts in the evidence. *See Rodriguez*, 647 F.2d at 222. Dr. McFadden even noted

that the limitations in the Residual Functional Capacity Assessment "were difficult to determine and

were 'estimates,'" which the ALJ found to be indicative of "a lack of certainty in [Dr. McFadden's]

findings." (A.R. 688, 886.) Although the ALJ did not discuss the details of the treatment records,

"the reasoning is sufficiently specific to inform both [Plaintiff] and this reviewing Court of how [Dr.

McFadden's] opinion was evaluated." *Bourinot*, 95 F. Supp. 3d at 177.

Second, the ALJ gave little weight to Dr. McFadden's opinion because she "relied in part on

[Plaintiff's] subjective complaints," which Dr. McFadden herself questioned in a contemporaneous

treatment note. (A.R. 688.) With respect to fibromyalgia, "courts . . . have recognized . . . that 'there

are no objective tests which can conclusively confirm [fibromyalgia]." *Green-Younger v. Barnhart*, 335

F.3d 99, 108 (2nd Cir. 2003) (quoting *Preston v. Sec. of health and Human Servs.*, 854 F.2d 815, 818 (6th

Cir. 1988). "It is therefore a medically sound and appropriate *diagnostic* tool for a physician to rely on

14

a patient's subjective reporting of her pain." *Ortiz v. Colvin*, 2015 WL 6182470, at *7 (D. Mass. Oct. 20, 2015) (emphasis added).  Plaintiff argues that, like the administrative law judge in *Johnson v. Astrue*, 597 F.3d 409 (1st Cir. 2009), the ALJ here impermissibly required objective findings in discounting Dr. McFadden's opinion. In *Johnson*, however, the administrative law judge erred by "requiring objective evidence beyond the clinical findings necessary for a *diagnosis* of fibromyalgia under established medical guidelines." *Id.* at 412 (emphasis added) (quoting *Green-Younger*, 335 F.3d at 106-07). Here, the ALJ accepted the diagnosis of fibromyalgia and explicitly considered it in determining Plaintiff's RFC, so the issue in this case is not entirely identical to that in *Johnson. See Howcroft v. Colvin*, 2016 WL 3063858, at *11 (D.R.I. Apr. 29, 2016) (finding there was no *Johnson* error where the administrative law judge "accepted both the diagnosis of fibromyalgia and that fibromyalgia [had] caused [the plaintiff] to experience pain").

Although objective evidence is not required to support a *diagnosis* of fibromyalgia, "objective medical evidence is a useful indicator to assist the administrative law judge in making reasonable conclusions about the intensity and persistence of an individual's symptoms and effects those symptoms may have on the individual's ability to function." *Brown v. Colvin*, 111 F. Supp. 3d 89, 99 (D. Mass. 2015) (quoting 20 C.F.R. § 404.1529(c)(2)). In fact, a Social Security Ruling regarding the evaluation of fibromyalgia requires that there be "sufficient *objective evidence* to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity" before the Commissioner "finds that a person with a medically determinable impairment of fibromyalgia is disabled." SSR 12-2P, 2012 WL 3104869, at *2 (July 25, 2012) (emphasis added). In other words, some objective evidence is necessary in order to determine the severity of a plaintiff's fibromyalgia to support a finding of disability. In *Barowsky v. Colvin*, 2016 WL 634067, at *4 (D. Mass. Feb. 17, 2016), the administrative law judge found that "the objective evidence [of record] [fell] short of demonstrating the existence of pain and limitations of

such severity as to preclude [the plaintiff] from performing any work on a regular and continuous basis." *Id.* at *4. There, the court upheld the administrative law judge's decision, concluding that "it does not follow from a diagnosis of fibromyalgia that a [plaintiff] is necessarily disabled." *Id.*

Similarly, the lack of any objective evidence consistent with Plaintiff's claimed limitations and those attributed to Plaintiff in Dr. McFadden's Residual Functional Capacity Assessment (i.e. "observed discomfort, mechanical testing demonstrating limitations, numbness, or reduced functioning") supports the ALJ's decision to discount Plaintiff's subjective reporting and, in turn, Dr. McFadden's opinion. For example, at a June 2010 appointment with Dr. Puri, Plaintiff performed various exercises including walking on her heels and toes and performing a full squat. (A.R. 361.) At this appointment, Plaintiff did not need "help changing for exam or getting on and off [the] exam table" and Dr. Puri observed Plaintiff to be in no acute distress. (*Id.*) Dr. Puri also noted Plaintiff's activities of daily living, which included "some cooking, cleaning, laundry, and child care" as well as the ability to "shower, bathe, and dress" herself. (*Id.* at 360); *see Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 23 (1st Cir. 1986) (holding consideration of a plaintiff's daily activities appropriate in evaluating subjective complaints of symptoms); *see also Costa v. Astrue*, 2011 WL 1155263, at *11 (D. Mass. Mar. 25, 2011) (applying *Avery*, the ALJ appropriately relied on the plaintiff's daily activities to support his determination that the plaintiff's complaints were not consistent with objective medical findings of the record). However, unlike Dr. Puri, Dr. McFadden did not take note of any performed exercises or activities of Plaintiff's daily life, except for Plaintiff's reported inability to perform heavy cleaning or heavy lifting, to support Plaintiff's subjective reports and Dr. McFadden's recommended limitations. (*Id.* at 886.)

The ALJ found that the record did not support Plaintiff's subjective reports to Dr. McFadden because the reports about her level of pain "far exceed[ed] any of the objective, documented evidence on file." (*Id.* at 685.) Although the ALJ found that Plaintiff's "medically

determinable impairments could reasonably be expected to cause the alleged symptoms," he found

the "intensity, persistence and limiting effects of [the] symptoms" to the extent alleged were not

credible. (*Id.*) Applying the "daily activities" factor from *Avery*, the ALJ supported his conclusion by

pointing to Plaintiff's ability to handle a "wide range of activities of daily living independently that

include[] childcare, preparing meals, going for walks, and . . . other household chores." (*Id.* at 360-64;

685); *see Avery*, 797 F.2d at 23. The ALJ also noted that Plaintiff "consistently presents as neatly

groomed and appropriately dressed and handles self-care independently." (*Id.* at 685.) The ALJ

appropriately considered Plaintiff's daily activities in seeking to substantiate her subjective reports as

well as Dr. McFadden's assessment.

Moreover, apart from the lack of objective evidence, the ALJ had an adequate basis for

rejecting Plaintiff's subjective reporting due to a lack of credibility. Even more so than in other

contexts, "the 'credibility determination is a vital piece of the puzzle and therefore critical to the

outcome'" of fibromyalgia cases. *Howcroft*, 2016 WL 3063858, at *10 (quoting *Charpentier v. Colvin*,

2014 WL 575724, at *16). Dr. McFadden questioned Plaintiff's credibility in her treatment record

when she noted the inconsistency between Plaintiff's report of being able to sit for only five minutes

at a time and Plaintiff's demonstrated ability to sit comfortably for the entirety of a 25 minute

appointment. (A.R. 886.) At the administrative hearing, Plaintiff testified at length that she had

extreme manipulative limitations in her hands, rendering her "unable to fold laundry" and "unable

to lift," but Dr. Puri noted in her treatment record that Plaintiff's hand and finger dexterity were

intact with a "grip strength [of] 5/5 bilaterally" and Plaintiff reported an ability to do some laundry.

(*Id.* at 362, 712.) Plaintiff even contradicted herself at the hearing by first stating that she could

comfortably lift "probably five to ten pounds" and shortly thereafter stating that she is "unable to

lift" when asked "what functions [she is] unable to do." (*Id.* at 710-12.) Not only were Plaintiff's

subjective reports of symptoms inconsistent so as to support a diminished credibility finding, but, as

discussed in more detail below, Plaintiff's inconsistent reporting of her drug use also supports the ALJ's decision to question Plaintiff's credibility and, in turn, Dr. McFadden's opinion, which relied on Plaintiff's subjective complaints. In the end, the ALJ's decision to give little weight to Dr. McFadden's opinion was justified.

    C.   <u>Consideration of Plaintiff's Drug Use in Determining Plaintiff's Credibility</u>

Lastly, Plaintiff argues that the ALJ erred "by focusing on [Plaintiff's] past history of substance abuse in his credibility assessment." (Pl. Mem. 15.) The Commissioner argues "the ALJ appropriately used evidence relating to substance abuse in his credibility assessment because [Plaintiff's] conflicting statements on that issue undermined her credibility." (Defn. Mem. 14). On this point, Plaintiff focuses her argument on the ALJ's failure to conduct the analysis required to determine whether Plaintiff's drug use can be separated from other medical disorders. (Pl. Mem. 16.)

Plaintiff misconstrues the ALJ's consideration of Plaintiff's drug use in his credibility determination. As correctly articulated by the Commissioner, "it was not the drug use itself that undermined [Plaintiff's] credibility," but rather Plaintiff's inconsistent reporting surrounding her drug use. (Defn. Mem. 15.) The ALJ even clarified that Plaintiff's drug dependency does not have a material impact on her mental or physical functioning such that it forms the basis for her disability and, therefore, "drug and alcohol abuse analysis is not necessary." (A.R. 682.) Because the ALJ clearly stated that the drug and alcohol use are non-material, the ALJ did not need to attempt to separate the drug use from other possible medical disorders. *See Hayes v. Astrue*, 2013 WL 2325174, at *6 (D. Mass. Apr. 30, 2013) (holding "the issue of materiality refers to situations in which it is unclear whether a [plaintiff's] disability is the result of various mental disorders or limitations from drug and alcohol use" and that the administrative law judge appropriately considered the plaintiff's drug use in determining her credibility with regard to her complaints of pain); *see also Stefanowich v. Colvin*, 2014 WL 357293, at *4 (D. Mass. Jan. 30, 2014) (finding the administrative law judge's

consideration of the plaintiff's history of alcohol abuse in the context of his misreporting that history lends to the issue of credibility).  Moreover, the ALJ had no duty to assess whether substance abuse was a contributing factor to the disability determination because he found Plaintiff was not disabled. *See* 20 C.F.R. §§ 404.1535(a) and 416.935(a) ("*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to a determination of disability.") (emphasis added); *see also Stefanowich*, 2014 WL 357293, at *5 (holding "[a]n analysis of the materiality of a [plaintiff's] alcohol abuse is only necessary where all impairments, including substance abuse, render a [plaintiff] disabled").

Rather, Plaintiff's drug and alcohol use and the inconsistencies in the disclosure of such use contribute to the finding that Plaintiff's credibility is diminished such that the subjective statements relied upon in the medical analysis also have reduced credibility. (A.R. 685.) *See Stefanowich*, 2014 WL 357293, at *5 (holding administrative law judge properly relied on the plaintiff's misreporting of drug use in determining the plaintiff's credibility); *see also McDonald v. Astrue*, 2011 WL 3562933, at *13 (D. Mass. Aug. 15, 2011) (finding "inconsistent representations [of drinking history] provide a substantial basis to question [the plaintiff's] credibility"). In 2008, Plaintiff denied drug and alcohol use to Dr. Ufford, but admitted to drug and alcohol use at a 2009 appointment with Dr. Gul. (A.R. 206, 292.) On March 23, 2010, Plaintiff reported a history of drug and alcohol use since the age of seventeen. (*Id.* at 373-77.) Six days later, on March 29, 2010, Plaintiff reported a history of drug and alcohol use since the age of nineteen. (*Id.* at 467.) Then, on June 2, 2010, Plaintiff reported a history of drug and alcohol use since the age of fourteen. (*Id.* at 614.) Most notably, Plaintiff tested positive for marijuana on a June 24, 2010 toxicology screen after having denied drug use to Dr. Puri seven days prior. (*Id.* at 360, 492.) Further, at the February 10, 2012 follow-up appointment with Dr. McFadden, Plaintiff denied drug use, but tested positive for marijuana just two days later at a

Suboxane maintenance treatment. (*Id.* at 878, 998-1001.) Although the ALJ does not discuss in detail every instance of inconsistent reporting of drug use, the inconsistences are several and support the ALJ's finding that Plaintiff's credibility is diminished. As such, the court finds "the ALJ adequately assessed the totality of the record, including but not limited to Plaintiff's inconsistent reporting regarding [drug and] alcohol use, when assessing Plaintiff's credibility." *Stefanowich*, 2014 WL 357293, at *5. Accordingly, the court finds no error in the ALJ's consideration of drug use in assessing Plaintiff's credibility.

## IV.   CONCLUSION

For these reasons, the court DENIES Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 13) and therefore ALLOWS the Defendant's Motion to Affirm the Commissioner's Decision (Dkt. No. 17).  The clerk shall enter judgment for Defendant, and this case may now be closed.

It is So Ordered.


  /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District